```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF RHODE ISLAND
_____
                                   )
THE CITY OF PROVIDENCE,            )
                                   )
          Plaintiff,               )
                                   )
     v.                            )    C.A. No. 13-131 S
                                   )
BUCK CONSULTANTS, LLC,             )
                                   )
          Defendant.               )
_____)
```

## OPINION AND ORDER

WILLIAM E. SMITH, Chief Judge.

Before the Court is Defendant Buck Consultants, LLC's ("Buck") Motion for Summary Judgment (ECF No. 103) ("Buck's Motion" or "Def.'s Mot."). The City of Providence (the "City") filed an opposition (ECF No. 108-1) ("Pl.'s Opp'n"), and Buck filed a Reply (ECF No. 115-2) ("Def.'s Reply"). The Court conducted a hearing on July 21, 2015, and both the City and Buck submitted post-hearing memoranda (ECF Nos. 134 and 137, respectively). After careful consideration, Buck's Motion is GRANTED for the reasons set forth below.

I.  Background[1]

The City is suing Buck, its longtime pension actuary, for negligence. In short, the City alleges that Buck overestimated the amount the City would save by suspending cost of living adjustments ("COLA's") for the City's pension plans, causing the City to negotiate a settlement with the unions representing police officers and firefighters, as well as the association representing retired police officers and firefighters, that it would not have agreed to had it known of Buck's error.

In February 2011, a "Municipal Finance Review Panel" convened by Mayor Angel Tavares released a report on the City's financial condition; it found "that the City would face deficits of $70 million and $110 million in fiscal years 2011 and 2012, respectively" and that "a prime mover of the City's fiscal crisis was its retirement system." (Pl.'s Opp'n 3, ECF No. 108-1.) In October 2011, the Providence City Council established a subcommittee to evaluate concerns about the impact of COLA's on the cost of the City's pension system. On April 30, 2012, after reviewing the subcommittee's findings, the City Council enacted an

---

[1] The Court must view all facts in the light most favorable to the non-moving party on summary judgment. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997). The material facts are undisputed, but to the extent that there are disputes, the City's version of the facts is presented.

ordinance suspending COLA's as of January 1, 2013, Chapter 2012-20 Ordinance No. 276 (the "Pension Ordinance").

In May 2012, the City and the Providence Retired Police and Firefighters' Association, Inc. (the "Retiree Association") were ordered into mediation in litigation concerning the constitutionality of another ordinance requiring that retirees switch from their existing healthcare plans to Medicare, Chapter 2011-32 Ordinance No. 422 (the "Medicare Ordinance"). The mediation covered issues related to both the Medicare Ordinance and the Pension Ordinance. In addition to the City and the Retiree Association, the mediation included representatives from Local 799 of the International Association of Firefighters, AFL-CIO, and the Providence Fraternal Order of Police Lodge No. 3 (collectively, the "unions"), to represent the interests of current employees of the City.

In conjunction with the mediation, the City asked Buck to calculate the savings that would result from a ten-year suspension of COLA's. Buck estimated that a ten-year suspension would yield $180 million in savings. Relying on that estimate, the City entered into Memoranda of Understanding (the "MOUs") with the Retiree Association and the unions on May 22, 2012.

The City contends that Buck's estimate negligently overestimated the City's savings by using the incorrect start date for the COLA suspension (January 2011 instead of January 2013),

and that the estimate therefore should have been $170 million instead of $180 million.  The City claims that had it "been provided with a proper calculation, it would not have adopted the proposed change and it would have less financial liability." (Pl.'s Opp'n 1, ECF No. 108-1.)  Specifically, the City claims that it would have either demanded at least $10 million more in concessions from the unions, or alternatively, gone forward and enforced the Pension Ordinance, saving $80 million.  (See id. at 2, 48-49, 54-55.)

II. Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is only considered "'genuine' if it 'may reasonably be resolved in favor of either party.'"  Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) (quoting Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)).  When deciding a motion for summary judgment, the court must "examine[] the entire record 'in the light most flattering to the nonmovant and indulg[e] all reasonable inferences in that party's favor.'" Id. at 959 (quoting Maldonado-Denis, 23 F.3d at 581).

In support of its summary judgment argument, Buck points to four allegedly fatal flaws in the City's case. First, Buck asserts that it is undisputed that Buck actually underestimated, rather

than overestimated, the City's savings. Second, Buck claims that the experts agree that Buck's method of calculating the City's savings was reasonable. Third, Buck contends that the City cannot prove that Buck's alleged miscalculation caused the City any harm. Finally, Buck argues that the City's damages theories are inherently speculative. The Court will address each of these arguments in turn; but it is Buck's fourth argument that carries the day.

> A. There Are Questions of Fact In Dispute Concerning Whether Buck Overestimated the City's Savings

Buck first claims that "the testimony of <u>both</u> Buck's expert <u>and</u> the City's expert is that the City saved $199 million. For this reason, the City cannot prevail on its claim that Buck <u>overestimated</u> the savings." (Def.'s Mot. 1, ECF No. 103 (emphasis in original).) Unsurprisingly, the City tells a different story: "What Buck is attempting to do here should horrify any actuary: Buck asks this Court to evaluate an earlier actuarial valuation based on June 30, 2011 data by comparing it to the results of a later actuarial valuation based on June 30, 2012 data." (Pl.'s Opp'n 29, ECF No. 108-1.) The City further explains that the higher savings calculation could be due to the plan provision applying to more people than expected, which would actually result in higher financial liabilities. (<u>Id.</u>)

The bottom line is that the $199 million figure is not as clear-cut as Buck suggests.  Consequently, this Court finds that the City has shown genuine material facts in dispute concerning whether Buck's estimate was in fact an overestimation based on the data it was given.

> B.  There Are Questions of Fact In Dispute Regarding Whether Buck Breached Its Standard of Care

Buck next contends that summary judgment is warranted because "the City's expert [Daniel Sherman] used the same method the City now contends is improper when he performed similar estimates for the City," and conceded at his deposition that this method was "reasonable." (Def.'s Mot. 1, 8-9, ECF No. 103.)  The City retorts that the argument that Mr. Sherman "used Buck's patented-COLA-skipping formula when he served as the City's actuary is both incorrect and irrelevant."  (Pl.'s Opp'n 26, ECF No. 108-1.) According to the City, when Mr. Sherman provided a similar valuation, he "explicitly wrote, as required by the prevailing actuarial standards, that his valuation was performed '[a]ssuming the COLA had been eliminated as of July 1, 2010 . . . .'" (Id. at 26-27.)

Moreover, the City represents that Mr. Sherman will testify that Buck's "method of coding the COLA suspension and [its] failure to communicate alternate methods with the City violated Actuarial Standards of Practice ("ASOP") No. 4, Paragraph 3.2.1." (Id. at

23 (emphasis added).) It is not simply Buck's method in a vacuum that allegedly violated the standard of care, but the use of this method in these particular circumstances, including what was communicated (and not communicated) to the City. While Buck's expert will surely put forth an opinion to the contrary, "[a]t summary judgment . . . courts normally assume that the trier of fact would credit the expert testimony proffered by the nonmovant." Den Norske Bank AS v. First Nat'l Bank of Boston, 75 F.3d 49, 58 (1st Cir. 1996). Additionally, the City points to several admissions of Buck's actuaries that suggest that there was an error in Buck's valuation. (See Pl.'s Opp'n 14-17, ECF No. 108-1.) Thus, the Court finds that there are questions of fact concerning whether Buck breached the applicable standard of care.

    C.    There Are Questions of Fact in Dispute Concerning Causation

Buck next argues that the City cannot prove that Buck's alleged breach proximately caused any damage to the City. Buck first claims that the City could not have relied on Buck's estimate in negotiating the settlement because "Buck did not produce its estimate until May 25 – three days after the date of the MOUs." (Def.'s Mot. 10, ECF No. 103 (emphasis in original).) However, as this Court held in its decision on Buck's Motion to Dismiss, "the MOU, executed on May 22, 2012, does not defeat the City's claim" because "[t]he City alleges that Buck made several calculations

involving a ten-year COLA suspension prior to that date." City of Providence v. Buck Consultants, LLC, No. CA 13-131 S, 2013 WL 4047133, at *1 n.2 (D.R.I. Aug. 9, 2013). On summary judgment, the City maintains that Buck "provided the City with at least three valuations of prospective COLA suspensions," including a valuation on May 8 "with terms nearly identical to the terms to which the City ultimately agreed." (Pl.'s Opp'n 36, ECF No. 108-1.) Whether it was reasonable for the City to rely on those earlier communications would be a question of fact for the jury.

Second, Buck contends that its estimate did not proximately cause any damages because the City was not bound by the settlement agreement when it discovered the alleged error. The MOUs clearly state that they are non-binding, and indeed, it does not appear that the City disputes this. The City instead argues that it would have been effectively impossible – and perhaps even more damaging – for it to terminate the settlement deal by the time it found out about Buck's calculation error. Relying on Slotkin v. Citizens Casualty Co. of New York, 614 F. 2d 301 (2d Cir. 1979), the City argues that the fact it was not legally bound to the settlement at the time it found out about the error is not fatal to its claim. (See Pl.'s Opp'n 38-40, ECF No. 108-1.)

In Slotkin, a medical malpractice plaintiff agreed to settle a case during trial based on the defendant's representation that the hospital's insurance policy limit was $200,000. 614 F. 2d at

314. Before the Court officially entered an order on the settlement, the plaintiff became aware that the hospital's policy was in fact up to $1 million; however, by that time, the plaintiff's health was in jeopardy, her doctors advised that she should not testify again, her experts refused to testify again, and she was running out of money to litigate the case. Id. at 305-09. The Second Circuit found that the plaintiff's fraud claim was not barred because, even though she could legally have reneged on the settlement and tried the case, it was reasonable for her counsel not to do so because of "the effort, risk, sacrifice, [and] expense" that would have been involved. Id. at 313-14.

This Court agrees with the Second Circuit's reasoning in Slotkin, and finds that a cause of action for damages arising from accepting a settlement is not barred simply because the plaintiff would have legally been able to get out of the settlement at the time the alleged misconduct came to light; instead, the relevant inquiry is whether "the effort, risk, sacrifice, or expense" of getting out of the settlement justified the decision not to do so. See id. Here, the City advances five reasons why its decision to go forward with the settlement even after learning of Buck's alleged error passes this test:

> (1) Reneging on the settlement agreement at the eleventh hour would have numerous adverse political and social consequences that were concrete but could not be easily measured, (2) the settlement agreement also ended the Medicare Ordinance litigation, (3) reneging on the settlement agreement could

>     expose the City to legal claims for breach of contract and
>     related torts, (4) reneging on the settlement agreement could
>     prejudice the City's defense of the constitutionality of the
>     Pension Ordinance, and (5) Buck vociferously denied that its
>     estimates were flawed in the manner it originally admitted,
>     thereby depriving the City of any certainty in its
>     deliberations.

(Pl.'s Opp'n 41, ECF No. 108-1.)  The Court finds that the City has presented sufficient evidence to create a question of fact as to whether its decision to go forward with the settlement even after finding out about Buck's alleged error was justified by the "effort, risk, sacrifice, or expense" that would have been involved in reneging on the deal with the Retiree Association and the unions at that point.

    D.    The City's Damages Are Speculative

Last, but not least, is Buck's argument that the City's damages are speculative.  Here, the City does not fare so well.

The City offers two damages theories: 1) but for Buck's overestimation, the City would have been able to negotiate a better deal with the Retiree Association and the unions, resulting in $10 million in savings; and 2) but for Buck's overestimation, the City would have enforced the Pension Ordinance, saving $80 million.  In support of these theories, the City points to the testimony of Michael D'Amico, the City's Director of Administration and "chief negotiator."  (See Pl.'s Opp'n 48-49, ECF No. 108-1.)  At his deposition, Mr. D'Amico testified that:

> Had the numbers been correct in the spring and we knew that the savings, in particular the ARC payment was not - was not going down as much as we thought it was, we would not have agreed to these terms with the unions and retirees.  We would have insisted on some further concession from those groups.
> . . .
> [I]f we could not have gotten some further concession to reach the savings that I thought we had reached based on Buck's calculations, it would have been my recommendation not to settle.  Because the savings were not going to be sufficient for our needs.

(Id. (citing Plaintiff's Statement of Undisputed Facts ("Pl.'s SUF") ¶¶ 61-63, ECF No. 111).)

If damages are merely speculative, summary judgment is warranted.  See Tiboni v. Milliman, Inc., CASE NO. 1:08 CV 1642, 2010 U.S. Dist. LEXIS 131896, at *26 (N.D. Ohio Aug. 10, 2010) (granting summary judgment because the plaintiff failed to "offer[] any testimony to show what changes the Trustees would have made or which decisions would have been altered (and how) if they had been given a more accurate estimate of the plan liabilities"); Lifespan/Physicians Prof'l Servs. Org., Inc. v. Combined Ins. Co. of Am., 345 F. Supp. 2d 214, 226-27 (D.R.I. 2004) (granting summary judgment where the plaintiff failed to present evidence that but for a misunderstanding about its insurance coverage, it would have acquired a policy that would have provided a higher reimbursement).  The City relies heavily on this Court's decision in Probate Court of City of Warwick ex rel. Lawton v. Bank of Am., N.A., 813 F. Supp. 2d 277 (D.R.I. 2011), to support

its argument that the fact finder may "consider evidence of the party's probable, alternative conduct." (Pl.'s Opp'n 51, ECF No. 108-1.) The Court does not disagree that it may consider a party's likely conduct; however, the problem for the City is that, unlike in Lawton, the evidence here is insufficient to infer what the City's "probable, alternative conduct" would be.

Even taking Mr. D'Amico's statements as true, the City has, at best, established that it would have *attempted* to negotiate a better deal, and that Mr. D'Amico would have *recommended* that the City not settle. The City does not present any evidence showing that it actually could have succeeded in getting any further concessions from the unions, let alone in what amount.[2] Indeed, Mr. D'Amico himself testified at the March 2013 Fairness Hearing in Rhode Island Superior Court - after Buck's alleged malpractice came to light - that further negotiations would have been to no avail. (See Def.'s Statement of Undisputed Facts ("Def.'s SUF") ¶¶ 89-91, ECF No. 103-1 (quoting Mr. D'Amico's testimony that, "[h]onestly, I think that was as far as we could go, that was the best we could do," "[t]his was the most that the retiree

---

[2] As this Court has already recognized, that "the mere fact that Buck may have overstated the City's savings by $10 million does not mean that the City suffered a loss of that amount." City of Providence v. Buck Consultants, LLC, No. CA 13-131 S, 2013 WL 4047133, at *2 n.4 (D.R.I. Aug. 9, 2013) (citing Tiboni v. Milliman, Inc., No. 1:08 CV 1642, 2010 U.S. Dist. LEXIS 131896, at *26 (N.D. Ohio Aug. 10, 2010)).

association was willing to do," and "that [the Retiree Association] would not give up anymore").)

In an attempt to lessen the blow of Mr. D'Amico's testimony, the City makes the absurd claim that, despite being "the City's chief negotiator" on whose testimony it relies heavily, Mr. D'Amico was merely a "non-party with an opinion" when he testified at the Fairness Hearing.  (Pl.'s Opp'n 48, 53, ECF No. 108-1.)  As Buck notes, the City cannot choose to rely on Mr. D'Amico's testimony as their "chief negotiator" only "when he provides evidence the City likes."  (Def.'s Reply 33, ECF No. 115-2.)  The City also argues that Mr. D'Amico's "belief that the counterparties would not further negotiate is not inconsistent with the determination to try anyway."  (Pl.'s Opp'n 52, ECF No. 108-1.)  That may be true, but in order to prove its damages theory, the City must do more than present evidence that it would have attempted to negotiate a better settlement; it must present some evidence that it actually could have been successful.

With regard to the City's second damages theory, the Court is not convinced that Mr. D'Amico's testimony that "it would have been [his] recommendation not to settle" (Pl.'s Opp'n 48-49, ECF No. 108-1) is sufficiently non-speculative to survive summary judgment, particularly given the risks in going forward and the number of decision-makers involved.  One of the City's attorneys testified at the Fairness Hearing that there was "a substantial

question about the likelihood of success in litigation for both sides" and that is "why there was such a risk to both parties in moving forward to a final disposition." (Def.'s Reply 35, ECF No 115-2.)  Furthermore, Mayor Taveras admitted that the City could not legally suspend COLA's without enabling legislation from the General Assembly, which the City repeatedly sought, but the Assembly never passed. (Id. at 37.)

However, even assuming that the City would have gone forward and enforced the ordinance, and prevailed in the consequent litigation despite the risks, the City's damages theory is still speculative. As Buck notes:

> The City makes no allowance for the costs of litigation, the costs and impact of the bankruptcy that it stated would occur if such litigation continued, the injury to its relationships with the Retiree Association and Unions that it mentions elsewhere in the Objection, and any number of other hurdles for it to cross before it would be able to enforce the Original Pension Ordinance.

(Id. at 35.)  Without taking into account the cost of litigation and any number of other costs the City would have incurred going that route, it is not at all clear that the City would have come out ahead, let alone $80 million ahead.  Thus, this Court finds that the City's damages are far too speculative to survive summary judgment.

III. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is hereby GRANTED.

IT IS SO ORDERED.

/s/ W E Smith
William E. Smith
Chief Judge
Date: November 13, 2015